[Cite as *In re N.E.*, 2010-Ohio-6012.]

STATE OF OHIO, BELMONT COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| IN RE: | ) | CASE NOS. 10 BE 1 |
| | ) | 10 BE 2 |
| N.E. and F.E., | ) | |
| | ) | O P I N I O N |
| DEPENDENT CHILDREN. | ) | |
| | ) | |

CHARACTER OF PROCEEDINGS:    Civil Appeal from Common Pleas Court,
Juvenile Division, Case Nos. 08JC353
and 08JC354.

JUDGMENT:    Affirmed.

APPEARANCES:
For Appellee:    Attorney Christopher Berhalter
Prosecuting Attorney
Attorney Rhonda Greenwood
Assistant Prosecuting Attorney
147A West Main Street
St. Clairsville, Ohio 43950

For Appellant:    Attorney Scott Essad
5815 Market Street, Suite 1
Youngstown, Ohio 44512

JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated: December 6, 2010

VUKOVICH, P.J.

¶{1} Appellant mother appeals the decision of the Belmont County Juvenile Court which granted permanent custody of her children to the Belmont County Department of Job and Family Services. Appellant first questions whether a dispositional hearing on temporary custody was properly held. Pursuant to statute, the dispositional hearing on temporary custody was permitted to be held immediately after the adjudication hearing.

¶{2} Appellant then argues that the initial finding of dependency was not supported by any evidence and that the court should have reconsidered the issue of dependency at the permanent custody hearing. However, where a party stipulates to the facts of a dependency complaint, no further evidence need be presented where, as here, the facts in the complaint are sufficient to show dependency. Moreover, the finding of dependency at the adjudication cannot be appealed at this time as dependency had already been established by the time of the permanent custody hearing and thus was not subject to relitigation.

¶{3} Appellant next contends that the award of permanent custody was contrary to the weight of the evidence and the finding of dependency was too outdated to use at the permanent custody hearing. As the children had admittedly been in temporary custody for more than twelve of the past twenty-two months, the court's only function at the permanent custody hearing was to determine whether there existed clear and convincing evidence that permanent custody was in the children's best interests. Once again, the court was not to reconsider dependency. Finally, the court's best interests finding was not contrary to the manifest weight of the evidence. As such, the judgment of the trial court is affirmed.

STATEMENT OF THE CASE

¶{4} On April 11, 2008, the Belmont County Department of Job and Family Services ("the agency") filed a dependency complaint against appellant regarding her fifteen-month-old twins, alleging that the children's condition or environment was such as to warrant the state, in the interests of the children, to assume their guardianship. See R.C. 2151.04(C). Specifically, the complaint alleged that in February, appellant drove a male sex offender's vehicle from Cleveland to Belmont County with her children. She waited there for the sex offender to be released from the Belmont

Correctional Institution on April 2. This did not occur because the man, who had sexually molested his seven-year-old brother, was arrested upon his release for failure to register as a sex offender.

¶{5} The complaint also stated that after her plans fell through, appellant and her children drifted to four different residences in the county. The residences were found to be filled with dog feces and dirty dishes. The smell was so bad that police officers found it difficult to breathe upon entering the residences, and at one point, they had to run out of the house. Caseworkers repeatedly found the diaperless children in dirty portable cribs containing bowls of food. The children's bodies were dirty and odorous. One of the twins was underweight and both were behind on immunizations.

¶{6} The children had been removed from appellant's care under emergency authority the day before the complaint was filed. An emergency shelter care hearing was held on the day the complaint was filed. The children's father was found to be deceased. Appellant agreed to emergency shelter care and was appointed counsel. The children, who were discovered to have developmental delays, fetal alcohol syndrome, and a chromosomal abnormality, were placed in a foster home.

¶{7} The adjudicatory hearing was held on May 16, 2008. The mother stipulated to the allegations in the complaint. The court held the temporary custody dispositional hearing immediately thereafter. In a May 16, 2008 judgment entry, the court noted the stipulation and found by clear and convincing evidence that the children were dependent. The court also found that temporary custody should be granted to the agency as placing the children in their home would be contrary to their best interests and welfare. The court stated that reasonable efforts were made to prevent or eliminate the need for removal and that their current placement is in the most family-like setting in close proximity to appellant's home and consistent with the special needs of the children. In February of 2009, the mother agreed to an extension of temporary custody.

¶{8} On August 12, 2009, the agency filed a motion for permanent custody of the children, who were two and one-half years old at the time. The motion stated that the children had been in the temporary custody of the agency for over twelve months. The agency alleged a lack of bonding due to the mother's sporadic visits. The agency noted the children's special needs and raised concerns that the mother cannot meet these needs, including transportation to and responsibility for medical appointments,

therapy sessions, and out-of-town hospital appointments. The agency pointed out the children's thriving response to the structure, consistency, and supervision of their foster family. The agency noted the mother's lack of stable housing, her repeated homelessness, her contact with a registered sex offender, her inability to deal with her own basic needs or her emotional issues, and her inability to understand how her own well-being and decisions directly affect the safety and well-being of her children.

¶{9} The permanent custody hearing was held on November 12 and December 7 of 2009. It was stipulated that the children had been in temporary custody for more than twelve of the last twenty-two months and that the children's best interests was the only remaining issue for the court. (Tr. 432). The court heard the testimony of various witnesses.

¶{10} A medical geneticist testified that the children suffered from a chromosome abnormality. (Tr. 11-12). They were also diagnosed with fetal alcohol syndrome, presenting indicators such as growth deficiency, decreased head size, developmental delays, small eye openings, and thin lips. (Tr. 9, 14). She opined that the children will have poor decision-making abilities in the future and will require set routines and stable environments with limited choices and close monitoring. (Tr. 16-17).

¶{11} The children's pediatrician testified that when she first examined the children in April of 2008, they presented like "two little monkeys." (Tr. 30). Their weight and head size were well below average. They were toe-walking and suffering global delays. (Tr. 31). The children attend physical therapy where the foster mother was trained in techniques to correct a head tilt and to decrease toe-walking. (Tr. 56-59). The children attend speech therapy where they initially had to learn how to play before therapy could actually begin. (Tr. 69).

¶{12} The Help-Me-Grow caseworker testified that she had never seen children acting the way these children did when they were first removed. They had no attention span, were abnormally active, climbed all over, grunted and growled, shoved food in their mouths so fast that they gagged and choked, and generally acted as if they had been "caged like animals." (Tr. 78, 88). She testified that she had never seen scores so poor in the social-emotional category. (Tr. 81). Their scores have increased in every area so that they now only have major delays in speech and social-emotional. (Tr. 101-104). The improvement was attributed to the multiple visits to

physicians and therapists and the foster mother's diligent work with the children at home. (Tr. 106). They were said to be at risk of falling further behind if there was stagnation in their therapy or care. (Tr. 108).

¶{13} An agency caseworker confirmed that the children's progress had much to do with their follow-through care at home. (Tr. 123). She also expressed that the mother continually uses time-outs for these young special needs children in a manner that is ineffective. (Tr. 124). It was reported that the mother shows confusion about which child she intends to put in time out. (Tr. 124, 166). The mother also failed to learn redirection techniques she was being instructed on. (Tr. 274).

¶{14} The foster mother testified that the children were "wild like little animals" when she first received them. (Tr. 129). They would not sit to eat, they grunted and growled, and they did not know how to play with a toy. She disclosed that it was a long process for her to get them to eat without shoving food in their mouths and choking on it. (Tr. 130). She noted that one child currently sees an eye doctor often due to an eye patch. (Tr. 146). She testified that she has attended 291 appointments with the children over the past nineteen months (although, some consisted of one visit with an appointment for each child). (Tr. 149).

¶{15} Testimony established that appellant failed to visit with the children from October 17, 2008 until January 13, 2009. (Tr. 157). She thus missed Halloween (where the children came dressed in costumes), Thanksgiving, Christmas, and the children's second birthdays. (Tr. 157-158). She provided no explanation to the caseworkers for her absence, and they had been unable to locate her during that time. (Tr. 230). The visits she did attend were described as unstructured and chaotic, with appellant failing to engage the children in play. (Tr. 231). Appellant did not independently act to ensure the children did not injure themselves or choke on food at the visitations. (Tr. 237, 275).

¶{16} It was established that appellant has poor personal hygiene as does her fiancé, who attends visits with her due to the fact that they also visit with their baby that was removed at birth. (Tr. 234). The visitation room smelled so bad once because of them that the visit had to be canceled. (Tr. 273). Even after being provided with information on cleanliness and free products, their odor still rubs off on the children, whose clothes then have to be changed as soon as they get home. (Tr. 159-160, 246).

¶{17} Appellant has a low-average IQ of 85. (Tr. 181). She has a short attention span and cannot stay on topic, often changing the subject during discussions on important medical subjects. (Tr. 241, 243). She would bring baby food to the visits and cannot seem to grasp the appropriate milestones of the children's development. (Tr. 236). She had five residences in the children's first fifteen months of life. Until the new baby and the fiancé were introduced at the visits, appellant rarely expressed physical affection for the children.

¶{18} It was alleged that she makes poor decisions. For instance, she continued to date a child sex offender even after her children were removed and she was instructed to terminate the relationship. (Tr. 221). She bought a car with settlement money from a car accident and titled it in the name of the sex offender, who later caused the car to be impounded. (Tr. 379). Appellant testified that this sex offender would have been the "perfect father" for her children and she had planned on starting a family with him. (Tr. 317, 350).

¶{19} Testimony was presented that appellant was evaluated as requested but never followed through on counseling until after the permanent custody motion was filed. (Tr. 249). She did not complete the requested anger management class. (Tr. 253). She was not required by her case plan to seek employment but was required to find stable housing. She had five known residences from the time the children were taken until the hearing, not counting her unknown locations during the period she failed to show up for visitation. (Tr. 213, 345-346). Until the most recent residence, none of the residences were found to have been proper for the children. (Tr. 257-258).

¶{20} Multiple state witnesses testified that it was in the children's best interests to have a legally secure placement and that they did not believe appellant could provide the children with the security they need. (Tr. 259, 286, 295). It was expressed that appellant cannot take care of her own needs, let alone those of two special needs children. (Tr. 286, 296).

¶{21} On December 22, 2009, the court released its judgment entry. The court found that appellant has compulsive disorders and phobias. It was pointed out that appellant did not meet her case plan goals of increasing her insight on special needs children and that she admitted that she would need help raising the children. The court mentioned the children's unstable housing situation and the mother's relationship

with the sex offender. It was noted that appellant's only income is money from her parents. The court also stated that the mother has no vehicle and poor personal hygiene. The court pointed to the unstructured, chaotic, and missed visitation sessions. The court found there did not appear to be a bond between the mother and children.

¶{22} The court concluded that the children need a legally secure permanent placement which the mother cannot provide and also found that reasonable efforts were made to eliminate the need for removal of the children from their mother. The court then held that permanent custody was in the children's best interests and granted permanent custody to the agency. Appellant filed timely notice of appeal.

<u>ASSIGNMENT OF ERROR</u>

¶{23} Appellant's first assignment of error contends:

¶{24} "THERE WAS NEVER A DISPOSITIONAL HEARING BETWEEN THE TIME THE CHILDREN WERE FOUND TO BE DEPENDENT AT THE MAY 16, 2008 ADJUDICATORY HEARING AND THE TIME THE DEPARTMENT MADE ITS MOTION FOR PERMANENT CUSTODY OF THE CHILDREN."

¶{25} Appellant argues that the court improperly failed to hold a bifurcated dispositional hearing on temporary custody after the adjudicatory hearing on dependency. As appellant notes, the reason for bifurcation is that there are different evidentiary rules applicable to the two stages. See *In re Baby Girl Baxter* (1985), 17 Ohio St. 3d 339, 233 (Rules of Evidence apply to the adjudicatory stage but not the dispositional stage).

¶{26} Juv.R. 34(A) provides in pertinent part:

¶{27} "Where a child has been adjudicated as an abused, neglected, or dependent child, the court shall not issue a dispositional order until after it holds a separate dispositional hearing. The dispositional hearing for an adjudicated abused, neglected, or dependent child shall be held at least one day but not more than thirty days after the adjudicatory hearing is held. The dispositional hearing may be held immediately after the adjudicatory hearing if all parties were served prior to the adjudicatory hearing with all documents required for the dispositional hearing and all parties consent to the dispositional hearing being held immediately after the adjudicatory hearing." Juv.R. 34(A). See, also, R.C. 2152.35(B)(1).

¶{28} Here, the trial court's May 16, 2008 adjudication order and order of temporary custody specifically states that the parties were served with all dispositional documents and that the parties agreed to hold the dispositional hearing immediately. This is permissible under the rule. See Juv.R. 34(A). Furthermore, appellant never objected to the procedure. In fact, appellant, with the advice of counsel, stipulated to the allegations in the complaint, thus dispensing with evidentiary issues regarding these dispositive facts.

¶{29} Finally, an adjudication by a juvenile court that a child is abused, neglected, or dependent followed by a dispositional order of temporary custody to the agency constitutes a final appealable order. *In re H.F.,* 120 Ohio St.3d 499, 2008-Ohio-6810, ¶8; *In re Murray* (1990), 52 Ohio St.3d 155, syllabus. An adjudication that the child is abused, neglected, or dependent and any dispositional order that has been issued in the case under R.C. 2151.353 pursuant to the adjudication shall not be readjudicated at the permanent custody hearing. R.C. 2151.414(A)(1). Thus, any issues regarding temporary custody are appealable at the time the order is entered, not at the time of the permanent custody order. See *In re K.G.*, 7th Dist. No. 09MA56, 2000-Ohio-6531, ¶28. For all of these reasons, this assignment of error is without merit.

<u>ASSIGNMENT OF ERROR NUMBER TWO</u>

¶{30} Appellant's second assignment of error alleges:

¶{31} "IT WAS ERROR FOR THE TRIAL COURT TO FIND N.E. AND F.E. TO BE DEPENDENT IN THE ADJUDICATORY HEARING."

¶{32} Appellant first argues that the hearing on dependency was too cursory and that hearsay (the allegations in the complaint) was relied upon in making the adjudication. As appellant did not attach a transcript from the dependency hearing, this claim could not be evaluated. In any event, appellant stipulated to the facts in the complaint. In the face of an admission by the party-opponent that the facts placed in the complaint by the agency's employee are true, there are no hearsay issues. See Evid.R. 801(D)(2).

¶{33} Appellant's next argument here is that the facts in the complaint do not show dependency by clear and convincing evidence. See Juv.R. 29(E)(4). Although appellant acknowledges that neglect is more willful and fault-based than dependency,

appellant insists that the facts in the complaint show neglect, as opposed to dependency.

¶{34} The statutory definition of a neglected child includes: a child who lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian; a child whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being; or a child whose parents, guardian, or custodian neglects the child or refuses to provide the special care made necessary by the child's mental condition. See R.C. 2151.01(A)(2)-(4). However, the children were not alleged to be neglected. The children were only alleged to be dependent under R.C. 2151.04(C), which entails an allegation that the children's condition or environment was such as to warrant the state, in the interests of the child, to assume their guardianship.

¶{35} As appellant notes, the focus in a determination of dependency is on the condition of the children, not on the fault of the parents. *In re Colaner Children*, 166 Ohio App.3d 355, 2006-Ohio-2404, ¶25 (5th Dist.); *In re Bibb*, 70 Ohio App.2d 117, 120 (1st Dist.). Thus, appellant is merely arguing that the complaint alleges circumstances that are her fault as opposed to conditions that are not her fault.

¶{36} Contrary to appellant's suggestion, merely because the stipulated facts may fit both under the definition of neglect and under the definition of dependency does not mean the state must allege neglect. The existence of a poor condition includes conditions that are someone's fault and those that are not. See, e.g., R.C. 2901.22(E) (proof of a higher mental state is proof of a lower mental state). If the agency wishes to use the facts to prove merely that the children's condition or environment was such as to warrant the state to assume their guardianship to protect their best interests, then the agency can choose that route. Due to appellant's mental condition, the children's previously undiagnosed developmental issues, and appellant's poverty, the agency may not have wished to blame the situation directly on her and may have reasonably wished to focus on the children's condition as opposed to the parent's faults.

¶{37} According to the undisputed facts, appellant drove a male sex offender's vehicle from her residence in Cleveland to Belmont County with her children. She then found a place to stay while waiting for the sex offender to be released from the

Belmont Correctional Institute. The man, who had sexually molested his seven-year-old brother, was arrested upon his release from prison for failure to register as a sex offender. After her plans fell through, appellant and her children drifted to four different residences in the county. The residences were found to be filled with dog feces and dirty dishes. Police officers found it extremely difficult to breathe upon entering the residences. Caseworkers repeatedly found the diaperless children in dirty portable cribs containing bowls of food. The children's bodies were dirty and odorous. One of the children was underweight and both were behind on immunizations. The admitted facts clearly show that the children's condition and environment were such as to warrant the state to step in to protect their best interests. See R.C. 2151.05 (a child is without proper parental care if the home is filthy and unsanitary).

¶{38} Regardless, as set forth in assignment of error number one, a past finding of dependency cannot be readjudicated at the permanent custody hearing or at the appeal therefrom. R.C. 2151.414(A)(1). See, also, *In re H.F.,* 120 Ohio St.3d 499 at ¶8; *In re Murray*, 52 Ohio St.3d at 155; *In re K.G.*, 7th Dist. No. 09MA56 at ¶28. For all of these reasons, this assignment of error is without merit.

<u>ASSIGNMENT OF ERROR NUMBER THREE</u>

¶{39} Appellant's third assignment of error provides:

¶{40} "THE JUVENILE COURT'S DECISION GRANTING PERMANENT CUSTODY OF N.E. AND F.E. TO THE DEPARTMENT OF JOB & FAMILY SERVICES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE."

¶{41} The evidentiary standard in permanent custody cases is clear and convincing evidence. R.C. 2151.414(B)(1). Clear and convincing evidence is more than a mere preponderance of the evidence, as is the applicable standard in most civil cases. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74. Yet, clear and convincing evidence is not as high a burden as the beyond a reasonable doubt standard, which is applicable to criminal cases. Id. Clear and convincing evidence is that amount of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. Id.

¶{42} We must examine the record to determine whether the trier of fact had sufficient evidence before it to meet the requisite degree of proof. Id. We are guided by the rule that judgments supported by some competent, credible evidence going to

all the essential elements of the case should not be reversed by a reviewing court. Id. at 74-75, citing *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80; *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280.

¶{43} There are generally said to be two prongs to the permanent custody test that must be determined by clear and convincing evidence:  (1) permanent custody is in the best interests of the child; and (2) the child is orphaned or abandoned, the child has been in the temporary custody of CSB for twelve or more months of a consecutive twenty-two month period, or if none of these apply, the child cannot be placed with either parent within a reasonable amount of time or should not be placed with either parent.  R.C. 2151.414(B)(1)(a)-(d).  Appellant stipulated that the twelve of twenty-two months provision applies here.  Thus, the remaining issue is best interests.

¶{44} In determining the best interests of the child, the court must consider all relevant factors including, but not limited to:  the interaction and interrelationship of the child with his family members, foster caregivers, and others who may significantly affect the child; the child's wishes; the custodial history, including whether the child has been in the agency's temporary custody for twelve or more months of twenty-two consecutive months; the child's need for a legally secure placement and whether this can be accomplished without an award of permanent custody; and the factors listed in R.C. 2151.414(E)(7) through (11) (which factors are inapplicable here).  R.C. 2151.414(D).

¶{45} Appellant did not complete her case plan.  She did not go to any counseling sessions in the year after her children were removed.  She did not complete anger management classes.  She did complete two parenting courses, but her retention abilities seem impaired.

¶{46} Appellant has shown limited interaction with the children at visitation. Initially, she showed minimal affection.  Then, she went incommunicado for three months, missing three major holidays and the children's birthdays.  After she started visiting the children with their new half-sister, appellant expressed more physical affection for the twins but paid less attention to them during the total visit.  She never understood the need to get down on the floor with the children or to direct them or to seem interested in their play.  She did not initiate preventative or remedial actions to keep the children from falling or from shoving food into their mouths.  Considering the age and special needs of the children, she used time-outs too often and for innocuous

behaviors. During visits, she expressed no problems with her fiancé hitting a child on the back of the head, spanking a child, and holding a child down during a time-out. In general, the visits are unstructured and chaotic.

¶{47} Furthermore, appellant seeks to have her three children return to live with her in a one-bedroom apartment she shares with her fiancé, which apartment is paid for by her parents as she has no income and her fiancé's only income is from a few hours of babysitting. Appellant has no transportation, but the children have a multitude of appointments throughout each week to maintain their progress. Since the children's removal, appellant has attended no medical appointments and a limited number of family meetings.

¶{48} The children are special needs children who are at risk of stagnation and who are predicted to have difficulties throughout their lives. Besides the chromosomal abnormality, they have also been diagnosed with fetal alcohol syndrome, which carries a poor social-emotional prognosis. They absolutely require structure, interaction, and follow-through treatments at home as they have been consistently receiving from in their foster home where they have resided since April of 2008. The children are considered to be adoptable.

¶{49} Appellant still cannot comprehend how her own well-being and decision-making directly affects the children's conditions. She and the children lived with a sex offender who molested his seven-year-old brother. After he went to prison for a violation, she traveled hours away from her residence and took up a new temporary residence with her children in order to await his release from prison. She used what little money she had to purchase a car in his name.

¶{50} Appellant can barely maintain herself or keep her own appointments. She has been living a transient lifestyle. Her children were not properly fed. She kept the twins in unsanitary and filthy residences and kept the children diaperless, dirty, and odorous. She still has not learned personal hygiene after receiving instructions and free products. This issue is so extreme that a visitation was once canceled due to the intensity of her odor and the children's clothes have to be changed after visits.

¶{51} Finally, the children were under three years old at the time of the hearing. The children have a new half-sister, whom they have been seeing at the weekly supervised visitations with their mother. However, this sibling is also in the temporary custody of the agency. The children are not very bonded to appellant, and

they do not show affection to her like they do to other adults they have known for less time.

¶{52} Although some trier of fact could find otherwise, the trial court could reasonably find that there existed clear and convincing evidence that permanent custody is in the children's best interests after considering all of the factors set forth above. As such, this court shall not substitute its judgment for that of the trial court. This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER FOUR

¶{53} Appellant's fourth assignment of error states:

¶{54} "THE JUVENILE COURT WAS NOT SPECIFIC ENOUGH IN ITS JUDGMENT ENTRY ON PERMANENT CUSTODY."

¶{55} Appellant argues that the court should have analyzed why the children were dependent at the time of the hearing, as opposed to just mentioning that the children were previously adjudicated to be dependent. In support, appellant cites a case that is no longer good law. See *In re Fassinger* (1974), 43 Ohio App.2d 89 (interpreting Ohio law to require a contemporaneous finding of unfitness or that the child was neglected or dependent before permanent custody can be awarded).

¶{56} However, as the agency responds correctly, permanent custody presupposes a prior finding of abuse, neglect, or dependency. See R.C. 2151.414(B). A subsequent duplicative finding on one of these labels is not required at the permanent custody stage. See *In re Cunningham* (1979), 59 Ohio St.2d 100, 105-106 (best interests is the consideration at the permanent custody hearing, not parental unfitness).

¶{57} Once again, an adjudication by a juvenile court that a child is abused, neglected, or dependent followed by a dispositional order of temporary custody to the agency constitutes a final appealable order. *In re H.F.,* 120 Ohio St.3d 499 at ¶8; *In re Murray* (1990), 52 Ohio St.3d at syllabus. The adjudication that the child is abused, neglected, or dependent and any dispositional order that has been issued in the case under R.C. 2151.353 pursuant to the adjudication shall not be readjudicated at the permanent custody hearing. R.C. 2151.414(A)(1). Thus, the dependency finding was final, and it was not the permanent custody court's duty to readjudicate that issue. Consequently, this assignment of error is without merit.

¶**{58}** For the foregoing reasons, the judgment of the trial court is hereby affirmed.

Donofrio, J., concurs.
Waite, J., concurs.